[No. 33401. Department One. December 15, 1955.]

HOWARD WILLIAMS, *Respondent*, v. S. H. KRESS & COMPANY, *Appellant*.[1]

[1]Reported in 291 P. (2d) 662.

*Graves, Kizer, Greenough & Gaiser* and *Robert D. Skidmore*, for appellant.

*Henry Opendack*, for respondent.

SCHWELLENBACH, J.—S. H. Kress & Company is in the general merchandise business. It operates 264 retail stores throughout the United States and Hawaii. The Benjamin Ansehl Company, of St. Louis, manufactures toilet articles, cosmetics, and drug products, which it sells to large chain store organizations, wholesalers, and general merchandise companies. It prepares and markets a product called "Aseptisol." Kress & Company is a large purchaser and distributor of this product. Affixed to each bottle of Aseptisol is a label, which reads:

"A safe, efficient antiseptic and deodorant for home and hospital use—agreeable and convenient. Use full strength for:

| | | |
|---|---|---|
| Bad Breath | Burns | Abrasions |
| Mouth Wash | After Shaving | Cuts |
| Insect Bites | Astringent | Dandruff" |

Mrs. Grace Williams is a housewife living in Spokane. May 14, 1954, she purchased a bottle of Aseptisol at the local Kress store. She had never before used this product. We quote her testimony as to what occurred after she arrived home:

". . . and I walked over to the sink in preparation to gargling with the Aseptisol which I had purchased, and I took it into my mouth and tipped my head back to gargle with it and the taste was so strange and obnoxious I swallowed some accidentally. I gulped and swallowed it and very shortly after that I felt nauseous and ill.

". . . This nauseous feeling, this terrible, miserable feeling kept up for, oh, perhaps thirty minutes and I began to vomit, and I became violently ill and vomited profusely until there was nothing left in my stomach. I was just wretching from the effect of this."

The husband testified:

"Well, she took the lid off the bottle and put a small quantity of it in her mouth and tipped her head back to gargle with it, I presume, and her eyes got big and she

turned a pale color and made a dive for the bathroom and I could hear her gagging in there. . . . MR. OPENDACK: Q. Did you at this time taste the Aseptisol or put it in your mouth to try it? A. Yes, I took the bottle and took a little bit of it to taste it to see what it was, to see if I could tell what was in it. Do you wish me to describe it? It tasted to me like a mixture of liquid soap and cheap perfume and fly spray, as far as I could tell. Q. Did you have any ill effects from it yourself? A. I didn't swallow any of it. I got rid of it immediately but it took me about two days to get the taste out of my mouth and I ate about everything there was in the kitchen, but it is just a taste that you couldn't get rid of. I mean it stuck with you."

Mrs. Williams testified that she could not sleep that night; that she was ill for three weeks, and that at the time of trial certain odors made her nauseous.

The following day, she went back to the store and complained about what had occurred. About a week later, she took the bottle back to the store manager. He emptied a bottle from his stock, poured half of the contents of Mrs. Williams' bottle into the empty bottle, gave back to her what remained, and arranged that the portion which he obtained be sent back to the headquarters of the company for a chemical test.

This action was commenced to recover damages for alleged injuries to Mrs. Williams because of the use of the mouthwash. Paragraph V of the complaint alleged:

"At the time of the purchase, the defendant had impliedly warranted that said "ASEPTISOL" was fit for use as a mouth wash, was wholesome and merchantable as such."

The case was tried to the court, and it awarded judgment for the plaintiff in the sum of one thousand dollars. This appeal follows.

Error is assigned in denying the challenge to the sufficiency of the evidence to establish a cause of action for breach of warranty; in entering judgment for respondent; in denying motion for judgment notwithstanding the verdict; and in finding facts from which a conclusion of causation could be drawn.

Mr. Anderson, the local manager, testified that he gave the bottle containing half of the contents of Mrs. Williams' bottle to Miss DuBois, the merchandise clerk, with instructions to mail it to the main office in New York, together with a report of the complaint of Mrs. Williams. Miss DuBois testified that she packed the bottle in tissue paper and attached Mr. Anderson's report to the box, which was addressed to the main office; sealed the package, and placed it in the receiving room for mailing. Mr. C. O. Hobbs, in the main office, testified by deposition that he received a bottle of Aseptisol, half full, wrapped in tissue paper, to which was attached Mr. Anderson's report concerning Mrs. Williams' complaint; that the following day he mailed it to the Benjamin Ansehl Company in St. Louis. Harry Ansehl, the president of the company, testified by deposition that he was in the office of Mr. Hobbs when the package from Spokane arrived; that he opened the bottle, smelled and tasted some of the contents, and suffered no ill effects; that he carried the bottle in his brief case to St. Louis, where he poured some of the contents into a beaker, which he gave to Mr. Young, their chemist.

Ralph E. Young, chief chemist for the company, testified by deposition concerning the ingredients in Aseptisol and concerning its preparation; that he made an analysis of the contents of the beaker, found them to be free from defect and identical with that of a normal batch; that he swallowed a portion—more than would be swallowed by anyone using it as a mouthwash, and had no ill effects whatsoever.

The trial court was of the opinion that the evidence of tracing the bottle from Spokane to St. Louis was very unsatisfactory. There was a discrepancy between the testimony of Mr. Hobbs and Mr. Ansehl as to how the bottle reached St. Louis, and its progress was not traced with the particularity which an F.B.I. agent would use in tracing a package containing evidence to be used in a criminal trial, from a county sheriff's office.

Be that as it may, it is undisputed that in 1954 the company produced 62,400 bottles of Aseptisol, and never re-

ceived a complaint. It is also undisputed that this bottle was one of a batch of 5,600 bottles, and that this was the only complaint received by purchasers of that batch.

The rule as to implied warranty is stated in *Mazetti v. Armour & Co.*, 75 Wash. 622, 135 Pac. 633, as follows:

"It has been accepted as a general rule that a manufacturer is not liable to any person other than his immediate vendee; that the action is necessarily one upon an implied or express warranty, and that without privity of contract no suit can be maintained; that each purchaser must resort to his immediate vendor. To this rule, certain exceptions have been recognized: (1) Where the thing causing the injury is of a noxious or dangerous kind; (2) where the defendant has been guilty of fraud or deceit in passing off the article; (3) where the defendant has been negligent in some respect with reference to the sale or construction of a thing not imminently dangerous.

"Within one of these exceptions, is to be found the reason for holding the manufacturer of patent or proprietary medicines to answer at the suit of the ultimate consumer. Direct actions are allowed in such cases because the manufacture of medicines is generally shrouded in mystery, and sometimes, if not generally, they contain poisons which may produce injurious results. They are prepared by the manufacturer for sale and distribution to the general public, and one purchasing them has a right to rely upon the implied obligation of the manufacturer that he will not use ingredients which, if taken in prescribed doses, will bring harmful results. Reference may be had to the following cases which sustain, and in which many other cases are cited which notice, this exception. [Citing cases.]"

We held in *Baum v. Murray*, 23 Wn. (2d) 890, 162 P. (2d) 801, that the uniform sales act is, in the main, a codification of the common law, but that it somewhat enlarges the liability of a seller and in turn offers him certain protection not given by the common law; that, when a statute is enacted covering generally a certain subject of substantive law, it should be followed and applied wherever applicable, irrespective of what the common law or rule of decision may have been theretofore.

Section 15, chapter 142, Laws of 1925, Ex. Ses. [*cf.* RCW

63.04.160, which omitted "(whether he be the grower or manufacturer or not)," from subsections (1) and (2)] provides:

"Subject to the provisions of this act and of any statute in that behalf, there is no implied warranty or condition as to the quality or fitness for any particular purpose of goods supplied under a contract to sell or a sale, except as follows: (1) Where the buyer, expressly or by implication, makes known to the seller the particular purpose for which the goods are required, and it appears that the buyer relies on the seller's skill or judgment (whether he be the grower or manufacturer or not), there is an implied warranty that the goods shall be reasonably fit for such purpose.

(2) Where the goods are bought by description from a seller who deals in goods of that description (whether he be the grower or manufacturer or not), there is an implied warranty that the goods shall be of merchantable quality.

(3) . . .

(4) In the case of a contract to sell or a sale of a specified article under its patent or other trade name, there is no implied warranty as to its fitness for any particular purpose."

In the *Baum* case, which involved the sale of sausage manufactured and sold by the defendant (the manufacturer-retailer), we held that he is in the best position to ascertain and know the quality and fitness for purpose of the food which he manufactures and sells; and that the buyer by implication makes known to him, the seller, that the particular purpose for which the food is purchased is for consumption, thereby making applicable subdivision (1) of the statute. We do not wish to extend the above rule to apply to a transaction between a purchaser and a seller who had nothing to do with the manufacture of the product sold. The situation would be different, of course, if the buyer actually relied on the seller's skill or judgment.

In the instant case, there is nothing in the record to indicate that Mrs. Williams, either directly or by implication, made known to the seller the particular purpose for which the mouthwash was required, nor that she relied upon the seller's skill or judgment. She merely went into the store,

saw several bottles of Aseptisol on the shelf, and purchased a bottle. There was no implied warranty that it would be reasonably fit for the purpose for which she purchased it, and subdivision (1) does not apply.

As to subdivision (2), the term "bought by description" is confined to cases where the identification of the goods which are the subject-matter of the transaction depends upon the description. See *American Soda Fountain Co. v. Medford Grocery Co.*, 128 Oregon 83, 262 Pac. 939. This was not such a transaction.

This was a sale of a specified article under its trade name, and came within the provisions of subdivision (4). Under it, there is no implied warranty as to its fitness for any particular purpose.

■ Under the facts and the law, appellant did not impliedly warrant that the Aseptisol sold to Mrs. Williams "was fit for use as a mouthwash, was wholesome and merchantable as such."

■ Furthermore, respondent did not sustain the burden of proof. As heretofore stated, it was established that Mrs. Williams purchased the bottle of Aseptisol from appellant; that she went home, opened the bottle and started to gargle; that she swallowed some and became ill. Appellant showed, by competent evidence, that the ingredients of Aseptisol are wholesome and that proper safeguards are used in its manufacture. It was even shown that the batch of 5,600 bottles from which this bottle came, was wholesome. Respondent did not have her portion of the contents of the bottle in question analyzed, in order to determine whether or not it was unwholesome. We held in *Geisness v. Scow Bay Packing Co.*, 16 Wn. (2d) 1, 132 P. (2d) 740, a food poisoning case, that, in an action against a food manufacturer for breach of warranty by the sale of unwholesome food, the plaintiff has the burden to establish not only the facts from which the warranty springs, but also the facts which show a breach of warranty, and the unwholesome character of food is not

established, nor a *prima facie* case made, merely by showing that the plaintiff became sick after eating it.

The judgment is reversed.

DONWORTH and OTT, JJ., concur.

HAMLEY, C. J., and FINLEY, J., concur in the result.

February 24, 1956. Petition for rehearing denied.