[L. A. No. 25295.   In Bank.   May 1, 1959.]

VESTA COGGINS, Appellant, v. IRENE HANCHETTE, Respondent.

Stephenson & Yelovich and George M. Stephenson for Appellant.

Chase, Rotchford, Downen & Drukker, Henry J. Bogust and Otto M. Kaus for Respondent.

SCHAUER, J.—Plaintiff appeals from an adverse judgment in her action to recover for personal injuries suffered when she slipped and fell on a floor undergoing repairs. We have concluded that plaintiff's complaints of prejudicial error in the jury instructions are without merit, and that the judgment should be affirmed.

It should be noted at the outset that the sole party defendant was not an owner or lessee of the premises wherein the accident occurred and that her only right to be in the premises, or to exercise any control thereover, was that which was incident to the performance of certain work pursuant to a contract hereinafter described.

On the day of the accident, in September, 1954, plaintiff was employed as a training supervisor by Pacific Telephone and Telegraph Company in San Pedro, with the duty of supervising and instructing student employes in the handling of long distance, or toll, operating. This work was done in a room known as the "training room." Defendant was engaged in the business of selling and installing floor coverings such as linoleum and asphalt tile. In August, 1954, defendant and the telephone company entered into a contract whereby defendant agreed to remove strips of mascapave linoleum from the concrete floor of a room in the telephone company building, called the "equipment room," and cover the entire floor with asphalt tile. One of defendant's employes, Roy Burrow, a tile mechanic who had been in the employ of defendant for some 18 years, was engaged in the work on the day of the accident; he was defendant's only employe on the premises on that day.

The equipment room was located adjacent to and immediately south of the training room in which plaintiff, her students, and other supervisors and students were working. To gain entrance into the training room it was necessary to pass through the equipment room from an entrance in the west wall of the latter room, then through a door located about midway in the south wall of the training room. Before the day of the accident the equipment room floor had a painted cement surface, maroon colored, with a strip of the same color linoleum cemented to the floor to provide walkways to and from the training room door through the equipment room. This linoleum runner was about 3 feet wide and extended generally in an easterly direction from the equipment room door, with its nearest edge about 3 feet south of the wall separating the two rooms, to a point opposite the training room door where it turned north to the training room entrance. As hereinafter appears, there is some conflict in the evidence as to whether this runner had been removed prior to the time of the accident.

Plaintiff and her assistant, Mrs. Marich, testified that when they went to work at 7 a. m. on that day, and when they left the training room for coffee at 9 a. m. and returned about 9:15, the linoleum runner was still in place. Mrs. Marich further

testified that when she went to the lounge for five minutes between 10 a. m. and 11 a. m. she noticed the runner had been removed. Two other telephone company employes, Mrs. Everett and Mrs. Peters, testified that they saw the runner in place about 8 a. m., but when they returned from their relief periods between 10 a. m. and 10:30 a. m. it had been taken up and the walkway was grayish in color.

Except for the 15-minute coffee break between 9 and 9:15 a. m. plaintiff remained in the training room from 7 until 11 a. m. While instructing students at the switchboard, which was located in the southeast portion of the training room, she wore a headset with one earphone and a mouthpiece and stood, or sat on a high stool nearby, where she could observe them. The students wore similar headsets. For verbal instructions all sat at a table located in the west portion of the training room, and wore no headsets. The door to the training room opened inward to that room and closed automatically; it was closed on the day of the accident.

Plaintiff testified that she had not been advised that work was to be done or was being done on the equipment room floor. When she returned from coffee at 9:15 she noticed that some sanding had been done, but no one was working on the floor at that time and the linoleum runner was still there. Between 9:15 and 10 a. m. she heard a noise which sounded like a vacuum cleaner but which stopped about 10 a. m., and some time between 10 and 11 a. m. she saw a man open the training room door and stick his head into the room for a few seconds. She was on the west side of the room; he did not look in her direction and she did not hear him say anything. She was aware, however, that "work was going on" in the equipment room at the time. At 11 a. m. plaintiff left the training room for lunch; her students had preceded her by two or three minutes, without incident. Plaintiff further testified that she opened the door, "took about one step out," bringing her foot approximately 12 inches into the equipment room, when her feet or foot slipped out from under her and she fell to the floor, thereby fracturing her wrist. She came to rest in a sitting position, her hips (at least in part) and her legs and feet extending out in the mastic emulsion diagonally away from the pathway leading from the training room door but her hand and fractured wrist being back on the "bare cement" of the "three-foot pathway." She "noticed there was this three-foot pathway running west" but did not "ever observe whether it went to the door." She looked back to see what had caused

her to slip, and saw a 3-inch oblong spot of mastic about 12 inches from the training room doorway; the spot had a skid mark through it. She then noticed for the first time that the linoleum runner had been removed and that, except for the strip or pathway of bare floor about 3 feet wide immediately adjacent to the partition wall separating the two rooms and extending westerly from the training room door toward the door of the equipment room, the equipment room floor appeared to be covered with mastic. She saw no marking on the border of the pathway. When asked ''Where were you looking as you walked out the door [from the training room to the equipment room],'' she replied ''I don't remember where I was looking—straight ahead of me, I guess.''

Defendant's employe, Burrow, testified that on the morning of the accident he had unloaded the sanding machine, asphalt tile, and tools for the floor job and was ready to commence work about 9:15 a. m. He knew telephone company personnel were using the training room and at that time he opened the training room door, put his head in, and said ''I am going to be working out here, watch your step.'' He then closed the door and proceeded to remove a 9-inch strip of tile from the equipment room floor, which took about four minutes. He testified that he neither saw nor removed any linoleum from the floor. He spent the next 45 minutes to an hour sanding the entire floor except for an area in the northwest corner, and about five minutes sweeping it. About 10:15 a. m. he struck off a ''pathway'' outlined with bright blue chalk, 3 feet from the partition wall, and thereupon walked into the training room, stood holding the door knob at arm's length, and spoke to the person he took to be the supervisor (later identified as Mrs. Everett) sitting on a high stool near the switchboard. He ''informed her . . . if they had any occasion to leave the room to be sure to caution the girls that there was work going on out there.'' At that time he saw four or five people in the training room, in the southeast portion; he did not recall seeing anyone leave or enter the training room from 9:15 a. m. until plaintiff came through the door and fell at 11 a. m.

After giving the second warning Burrow began spreading the mastic emulsion, starting at the extreme northeast corner of the equipment room and intending to cover the entire floor except for the chalk-marked pathway. The emulsion, very slippery when wet, was poured from a 5-gallon container onto the floor, a portion at a time, then spread with a trowel and allowed to set for a period of time to allow the water to evapo-

rate, after which it is sticky and the tile is applied. As Burrow applied the mastic he was in a kneeling position, moving back and forth in an easterly-westerly direction, going south, and working along the edge of the pathway. He did not see any foreign substance in the pathway when he struck the chalk line, and during the approximately 30 minutes he had been spreading the mastic the pathway was in front of him and within his view most of the time. He had reached a point about 16 feet south of the pathway when he first saw plaintiff standing in the emulsion 2 feet south of the pathway, with the door closing behind her. She appeared to have lost her balance, her feet were shuffling in the mastic, and she fell to a position such that "her right hip, calf of her leg, ankles" and "right forearm and elbow" were on the floor. Burrow jumped up, ran through the mastic, lifted plaintiff, and walked her onto the pathway.

Plaintiff's assistant, Mrs. Marich, testified she was directly behind plaintiff as they left the training room to go to lunch and saw plaintiff slip and fall about a foot from the threshold into the equipment room. After the fall the witness observed a spot of mastic with a skid mark through it at the point where plaintiff had started to slip. Mrs. Everett and Mrs. Peters had observed a man on his knees as they returned from their coffee break about 10:15 a. m., and saw mastic had been applied to one section of the equipment room floor. They did not again leave the training room until after plaintiff's fall. Neither witness saw any chalk marks bordering the pathway at any time, and both they and Mrs. Marich testified that no one came into the training room or said anything to them about work being done in the equipment room.

As grounds for reversal plaintiff complains that the court erred to her prejudice in the giving of two jury instructions requested by defendant.

The instructions to the jury explained in general terms negligence, contributory negligence, ordinary care, and proximate cause, and then specifically declared that "The issues to be determined in this case are these:" First, was the defendant negligent? Second, was such negligence, if any, a proximate cause of any injury to plaintiff? Third, if so, was plaintiff guilty of contributory negligence?

At plaintiff's request the jury were then instructed that as a matter of law plaintiff "was an invitee on the premises where the injury occurred"; that "One who goes upon the premises of another as a business visitor at the express or implied invi-

tation of the owner or occupant, and in connection with some mutual business interest with the owner or occupant, or with the latter's own business, is called in law an invitee''; that the defendant's ''rights and duties in relation to the plaintiff were the same as if she, said defendant, had been the lawful occupant and owner of . . . the portion of the property where the injury occurred.''

The following instruction was also given, which is a generally correct statement (see *Raber* v. *Tumin* (1951), 36 Cal.2d 654, 658 [3] [226 P.2d 574]) of the duties of land occupier to invitee: ''Toward an invitee it is the duty of an occupier of property in the conduct of any active operations on the property, to use ordinary care to avoid any injury to the invitee, and to use ordinary care to keep the premises in a condition reasonably safe for the invitee in the reasonable pursuit of a purpose embraced within the invitation, but the responsibility of one having control of the premises is not absolute; it is limited to the performance of certain duties defined in my instructions. If there is danger attending upon the entry, or upon the work which the invitee is to do on the premises, and if such danger arises from conditions not readily apparent to the senses, and if the occupant has actual knowledge of that, or if they are discoverable by him in the exercise of ordinary care, it is the duty to give reasonable warning of such danger to the invitee. The occupant is not bound to discover defects which reasonable inspection would not disclose and he is entitled to assume that the invitee will perceive that which would be obvious to her upon the ordinary use of her own senses. . . .''

The first of the instructions of which plaintiff complains reads: ''You are instructed that an invitee coming upon premises in the process of construction is invited to use the premises in their then condition. Put in another way, the invitation is merely to use the premises in whatever condition they are in at the time of the entry.''

The instructions were correct in telling the jury that one who (like defendant here) on behalf of the land occupier creates a condition thereon has the same liability as the occupier for bodily harm caused to others while the work is in his charge. (2 Rest., Torts, § 384; *Donahoo* v. *Kress House Mov. Corp.* (1944), 25 Cal.2d 237, 245 [153 P.2d 349]; *Hall* v. *Barber Door Co.* (1933), 218 Cal. 412, 419-420 [5, 6] [23 P.2d 279].) Plaintiff complains, however, that the ''uncompleted building'' or ''process of construction'' instruction in effect

tells the jury that "the owner/occupier does not owe the duty to the invitee to refrain from active negligence, nor to exercise ordinary care to keep the premises in a reasonably safe condition, nor to use reasonable care to discover danger, nor to warn of danger. The effect of the instruction is to make the question of negligence of the occupier, and contributory negligence and assumption of risk by the invitee in cases involving structures in the process of construction or repair, *ipso facto*, a matter of law to be always resolved in favor of the owner/occupier."

Assuming that, standing alone, the instruction of which plaintiff complains would or could have the effect which she argues, we believe that no such result reasonably ensues when the instructions are considered as a whole, as the court told the jury to do. The premises here were admittedly under repair and, rather than telling the jury that the questions of negligence and contributory negligence had been resolved as matters of law, the instructions, as already pointed out hereinabove, plainly stated that the issues which the jury were to determine were those of negligence, contributory negligence, and proximate cause. Defendant's duty to use ordinary care in her operations, to keep the premises in a reasonably safe condition, and to warn of dangers known or reasonably discoverable in the exercise of ordinary care, were all explained. The jury were further told that "In the absence of appearances that caution her, or would caution a reasonably prudent person in like position . . . the invitee has a right to assume that the premises . . . are reasonably safe for the purposes for which the invitation was extended, and to act on that assumption. . . . [T]he duty of an invitor is subject to this overlying principle, that if and when an invitor actually learns that an invitee is in imminent danger of injury, and if, by exercising ordinary care, the invitor can minimize or thwart that danger, his duty is to apply such care to such a purpose." Furthermore, at plaintiff's request the court instructed that "If a dangerous or defective condition of or on property is created by the negligent conduct of the occupier or his employee acting within the scope of employment, and if the invitee thereafter suffers injury of which such condition was a proximate cause, in any action that the invitee may bring for damages for such injury, the law conclusively presumes that the occupier had knowledge of said condition from the time of its creation.

"When an unsafe condition which causes injury to an invitee has been created by the occupier of the property himself, or by an employee within the scope of his employment, the invitee

need not prove the owner's notice or knowledge of the dangerous condition. Such knowledge is imputed to the owner." This instruction, coupled with the additional specific direction that "Although the evidence . . . shows that defendant was not the owner of the portion of the premises where the injury occurred, it does show that she was the lawful occupant thereof and in rightful possession. Her rights and duties in relation to the plaintiff were the same as if she, said defendant, had been the lawful occupant and owner of the fee title to the portion of the property where the injury occurred," fully support the trial court's conclusion that the jury were not misled to plaintiff's prejudice by the "process of construction" instruction.

The same is true of the other instruction of which plaintiff complains, which reads: "No inference of negligence on the part of the defendant arises from the mere proof that the plaintiff fell while crossing the 'path portion' of the floor, or from the mere proof that the 'path portion' of the floor was slippery, in the absence of proof that slippery or dangerous condition of the 'path portion' of the floor, was created by or known to the defendant." Plaintiff urges, first, that this instruction erroneously suggests the necessity of proof by an eye witness that defendant put a spot of mastic on the path portion before an inference of defendant's negligence could arise, and, second, that the instruction is incomplete in failing to add the specification that defendant had the duty to exercise ordinary care to discover any dangerous condition. In the first place, however, there is no evidence, and none is suggested, that any one other than defendant, through Burrow, created any slippery condition, and consequently no prejudice to plaintiff appears. Secondly, as hereinabove shown, other instructions fully explained to the jury defendant's duties of care and responsibility for the conditions created by her employe. As already stated, they were told that defendant had the duty to warn of any danger from the work or conditions, discoverable in the exercise of ordinary care, and they were further specifically instructed that "The duty of an occupant of premises to warn invitees of dangers not readily apparent to the senses, of which the occupant has knowledge or which are discoverable by the occupant in the exercise of ordinary care, is a duty which cannot be delegated, and a warning given by the occupant of such danger to an invitee's employer, or to an invitee's fellow-employees is not imputed to the invitee."

[6] It also bears mention in respect to the question of

prejudice, if we assume error, that the verdict of the jury was unanimous and that the trial court considered and passed on a motion for new trial. In her points and authorities in support of her motion for new trial plaintiff urged, among other things, that ''When the Motion for New Trial comes before the Trial Judge, it is his duty to review the evidence, weigh the inferences fairly deducible from the facts and thereby determine whether the verdict was fair and just as to the paramount issue in the controversy.'' Furthermore, plaintiff specified, ''The trial judge is not only authorized, but required, to exercise an independent judgment upon the issues of fact presented. A judge acts as the thirteenth juror.'' We must assume that the trial judge in passing on the motion for new trial fully performed his duty.

We note also, in connection with plaintiff's attack before us on the instruction relative to the duty of an invitee (quoted *supra*), that in her ''Points and Authorities in Support of Motion for New Trial'' plaintiff contents herself with quoting the instruction but adds not one word by way of suggestion or explanation as to how that instruction, either in the light of the other instructions or otherwise, could reasonably be held to have misled the jury. Regardless of the extent to which the points and authorities may have been augmented on oral argument the trial court obviously was not convinced that a miscarriage of justice had occurred. Nor are we.

While on the record it appears that the jury could have resolved the issues of fact in favor of plaintiff it must also be recognized that the determination of those issues was the function of the jury and that the record fully supports them in the conclusions they impliedly reached. No ground warranting reversal has been shown. The judgment is affirmed.

Gibson, C. J., Shenk, J., Traynor, J., Spence, J., McComb, J., and Peters, J., concurred.